LEWIS F. HAMMELL

v.

SALLIE H. HYATT et al.

[Filed December 12th, 1899.]

1. Where, by reason of extreme old age and feebleness, the memory of a grantor has so failed that she is unable, when the deed is made, to compre-hend the nature of the property being dealt with, or to understand her relation to it, or power over it, and is incapable of recognizing facts as to its previous disposition, which are directly within her personal knowledge, observation and participation, such a grantor cannot be held to be competent to convey such property by deed.

2.  One who assumes the care of an extremely aged person, of feeble strength
.and failing memory, who is so dependent that she cannot safely be permitted
.to be alone, is bound to deal with the weaker party with absolute candor and
fairness and to protect her interests, and the caretaker will not be allowed to
receive a benefit obtained by inducing or permitting the weaker party to act
·under beliefs known by the caretaker to be false.

3.  A deed obtained by the caretaker from the weaker party, where the only
substantial consideration is an agreement to support, will not be sustained
where there is evidence that the grantor was induced by a false belief to make
the deed, with the knowledge or contrivance of the grantee, and where the
.agreement to support does not appear on the face of the deed, and is so under
.the control of the grantee that she may at her option avoid it.

On bill, answer and proofs.

The bill in this case is filed by Lewis F. Hammell, of Phila-
·delphia, the son of Elizabeth A. Hammell, deceased, who de-
parted this life April 8th, 1898, at the age of eighty-three, testate,
by a will dated the 10th day of January, 1894.  The bill seeks
to set aside a deed made by Mrs. Hammell conveying. the only
land she owned to her niece, Mrs. Hyatt, because it is alleged
Mrs. Hammell was mentally incompetent to make a deed, and
was induced to make it by fraud and undue influence on the
:part of Mr. and Mrs. Hyatt.  At the time of her death in April,
1898, Mrs. Hammell had living a daughter, Mrs. Cominsky,
·who resided in Baltimore, and her son, the complainant, Lewis
F. Hammell.  These were her children, her next of kin and
heirs-at-law.  By the terms of her duly-executed will, she gave
·all her real and personal property to her son, the complainant,
Lewis F. Hammell.

Since the year 1891, Mrs. Hammell had made her home at
the residence of her son, the complainant, who from that time
·up to the time of her death, cared for and maintained her with-
·out charge for her board and maintenance.  She appears to
have been possessed of a bond of the Chattanooga and Ten-
nessee Railroad Company of the face value of $1,000, on which
·interest was payable in semi-annual payments at the rate of
.seven and three-tenths per cent. per annum. · She was also the
·owner of a house and lot, the title to which is now in contro-

versy in this case, situated at No. 1010 Locust street, Camden, N. J., and of a few household goods and some clothing, which remained at her son's house in Philadelphia where she resided.

In the year 1897, and up to the month of August in that year, Mrs. Hammell was living with her son as above stated.

In the early part of August she came over to make a visit to her niece, the defendant Sallie H. Hyatt. Mrs. Hyatt had, in her girlhood, lived for a time with Mrs. Hammell, and the latter had occasionally visited at Mrs. Hyatt's house. The members of Mrs. Hyatt's family consisted, so far as the proof shows, of herself and her husband, William F. Hyatt, also a defendant in this suit.

At the time of the visit to Mrs. Hyatt in August, 1897, Mrs. Hammell was eighty-three years of age. She appears, physically, to have been of feeble strength but in fairly good health, so that she was able to go about, but her mental condition was so uncertain that she was not trusted to leave the house without an attendant. Her principal mental infirmity was the very serious impairment of her memory, which was not limited to the ordinary forgetfulness which attends upon old age. She had in 1894 freely and openly made and published her will in the presence of several witnesses, but was unable in 1897 to remember it, save as some sort of a paper which she signed, as she said, by her son's direction. She believed that the railroad bond for $1,000 which she owned, and which drew $7.30 interest, was a government bond on which $50 came to be payable on January 1st and July 1st of each year. She frequently inquired as to the health of persons in her own family whom she had known to be dead, and when told they were dead, would again repeat the inquiry. She continued to wear her underclothes for six weeks at a time and could not be induced to change them. She would wander out in the street from her house, and get lost, sometimes until late at night. She would look for things which she supposed she had lost, but could not tell what it was that she sought to find. She would continually repeat questions which had been answered. While visiting at her granddaughter's in Philadelphia, in January, 1897, she thought she was in Camden all the time and wanted

to go home; she could not remember what room she occupied on leaving her bed at night was unable to find it, to return to it. She had been advised not to handle a gasoline stove, but despite warning turned on several quarts of gasoline and was about to apply a lighted match, when restrained. She would eat a meal and at once eat another, forgetting the first, and be made sick by it. She did not recognize her granddaughter during the whole time of a visit she made at her house at Easter, 1897.

This was the condition of Mrs. Hammell shortly before her visit to Mrs. Hyatt, beginning August 1st, 1897.

Mrs. Hyatt was a favorite niece of Mrs. Hammell, and frequently visited the latter at her son's house, and must have known these infirmities of the old lady. Mrs. Hyatt is directly proven to have been told a number of these incidents. She admitted to Mrs. Boardman that she could not leave the old lady alone, as she was afraid she would set fire to the house; and she also told her cousin that the old lady was not fit to be left alone.

Mrs. Hammell remained at Mrs. Hyatt's house from August, 1897, until her death in April, 1898. On the 3d of December, 1897, an attorney-at-law, who had theretofore transacted some law business with Mr. Hyatt, was invited by him to call at his residence, by a postal card, as follows:

"CAMDEN, Dec. 3, 1897.

\* \* \* "Please call at my house at five o'clock to-morrow, Saturday, afternoon. I have some business of importance for you to attend to. The parties cannot come to the office. \* \* \*

"WILLIAM D. HYATT,
"636 Pine Street,
"Camden, N. J."

Mr. Boardman, a disinterested friend of the family, had also been invited to be present, not by Mrs. Hammell but by Mr. or Mrs. Hyatt, and had arrived a little in advance of the lawyer. Mr. Hyatt took Mr. Boardman up into his room, in the second story, and there told Boardman that he had sent for the lawyer, who was coming. Mr. Hyatt also told Boardman he would like him to be there. In the conversation with Mr. Hyatt,

which was about Mrs. Hammell's affairs, Boardman got the impression that Hyatt wanted Mrs. Hammell to make a will. Boardman, who had seen her within a month, who had known her for a long time, did not think she was competent to make a will, and for this reason refused to participate in the business, and came away almost at once after the lawyer arrived.

The lawyer had never seen Mrs. Hammell, and knew nothing of her previous history. He does not appear to have been told that previous to his arrival it had been intended to get a will or some like paper from Mrs. Hammell. He was not told by Mrs. Hyatt anything as to the mental condition of the old lady, nor that she was not fit to be left alone, nor was Mr. Boardman's refusal to be present and to participate in the business made known to the lawyer.

There were two more interviews between Mrs. Hammell and the attorney, both of them arranged by either Mrs. Hyatt or her husband. Mrs. Hyatt was present with Mrs. Hammell during all her conferences with the lawyer, and there seems to be no question that unless attended by some competent person Mrs. Hammell could not be trusted to go about.

On December 13th, 1897, the deed in dispute was made by Mrs. Hammell to Mrs. Hyatt, and the acknowledgment was taken by the attorney in Mrs. Hyatt's presence. The consideration expressed is

"the natural love and affection which she has unto the said Sallie H. Hyatt, and of one dollar lawful money of the United States of America and other valuable cons'deration well and truly paid by the said party of the second part to the said party of the first part at and before the ensealing and delivery of these presents," &c.

The deed makes no specification of what other valuable consideration than the $1 was paid. Nor does it in any way indicate that a separate written agreement, obliging Mrs. Hyatt to support Mrs. Hammell during her life, was an inducement to the making of the deed. The separate written agreement is dated the same day as the deed and refers to it as made. It is signed and sealed by both Mrs. Hyatt and Mrs. Hammell, but

is neither witnessed nor acknowledged by anyone, and of course was not recorded.   The deed was recorded on the day of its date, but the fact that it had been made was not communicated by Mrs. Hyatt in any way to the complainant, Mrs. Hammell's son, with whom she lived in Philadelphia.   On the 8th day of April, 1898, Mrs. Hammell died while still at Mrs. Hyatt's house.   Her son was notified of her serious illness the day before her death, but got to Mrs. Hyatt's house only after his mother was dead.   He took her body home and buried her from there.

*Mr. Alfred Hugg,* for the complainant.

*Mr. F. Morse Archer,* for the defendant.

GREY, V. C.

The deed from Mrs. Hammell to Mrs. Hyatt is attacked upon three grounds—*first,* because it is alleged Mrs. Hammell was on December 13th, 1897, the day of its date, incompetent to make a deed ; *second,* because it is claimed that Mrs. Hyatt obtained that deed to be made by fraud ; and *third,* because it is alleged she exerted an undue influence over Mrs. Hammell to induce her to make the deed.

The first contention is that Mrs. Hammell was incompetent to make the deed now in dispute.  The proofs show that Mrs. Hammell was eighty-three years of age.  She was quite feeble in strength but appears to have been physically able to go about from place to place.   Her mental powers had for several years been very seriously impaired because of the breaking down of her memory almost to the point of delusion.   This infirmity had increased upon her to such a degree that it is difficult to recognize her capacity to conduct a business transaction.   Mere lapse of memory, as indicated by inability to recall past events at will, is of course no ground upon which to deny capacity to contract. The proofs as to the condition of Mrs. Hammell go much farther than this.   She could not keep in mind the locality of her own home, or her room in the ·house where she was staying, or the

bed in which she slept. She forgot that she had eaten her meals. She was under the belief that her daughter, who had been dead some time, was still living, and when told she was dead would again speak of her as alive. At the very time of the execution of the deed now in dispute, she did not comprehend of what her estate consisted, for she spoke of her government bond drawing interest at $50 every six months, when in fact the only bond she had was a railroad bond drawing but $7.30 interest. She appears, when she made the deed, to have forgotten that she previously made a will in the presence of witnesses by full publication. She then actually believed that her son was defrauding her of her interest, when in fact he had been maintaining her for six years without charge, and she could get her interest at her own choice, her son in nowise preventing her.

She believed that her son was, against her wish, collecting the rents of the property conveyed by the deed in dispute, and that this conveyance was necessary to be made in order to prevent him from continuing to collect these rents, while the truth was that she was herself, unhindered by her son, personally collecting these very rents.

These failures of memory on the part of Mrs. Hammell left her in such a frame of mind that she was unable to have before her that consciousness of the property with which she was dealing, and of her relation to, dispositon of and control over it which were necessary to make her action in regard to it competent. The court of appeals, discussing the extent to which the destruction of the memory may impair the capacity of a contract, has declared that "a person who is oblivious of a former disposition of his property is as unfit to make a subsequent disposition thereof as if he was under an insane delusion as to its extent and character." *Haydock* v. *Haydock*, *7 Stew. Eq. 570.*

Mrs. Hammell's condition of mind at the time she made the deed was that of a person who is incapable of recognizing and appreciating the elementary incidents necessary to the conduct of business, though they are directly within her own knowledge and observation. Her condition of mind was that of a person acting under actual delusion, for she believed things to exist,

against her own knowledge and observation that they did not exist. Such a person cannot be held to be competent to make a contract.

The second ground of contention against the validity of the deed is that Mrs. Hyatt fraudulently induced Mrs. Hammell to make it, and the third point, that Mrs. Hyatt exerted an undue influence to secure the deed, may be considered together.

Of that sort of undue influence which is exerted by forceful assumption of a dominating control, there is no evidence in this case, but of that kind whereby the weaker party is misled into action by betrayal of confidence on the part of the stronger, upon whom she relied, and had a right to rely, there is a plenitude of proof.

If it be assumed that Mrs. Hammell had at times sufficient capacity to make the deed in question, it cannot be sustained if it were obtained from her by fraud or by the exertion of an undue influence, whereby Mrs. Hammell's independent action was prevented or she was misled by the superior capacity of those who had her in their care and in whom she rightfully placed her confidence.

From this point of view the deed in dispute may be considered in two different lights—as a conveyance for a valuable consideration and as a gift from Mrs. Hammell to Mrs. Hyatt. In considering either of these points the character of the parties and their relation to each other are of the greatest importance.

It is indisputably shown by all the proofs that Mrs. Hammell was in her extreme old age ; that her memory was so impaired that she was unfit to be trusted, unaided, to do the simplest things, even to go from one place to another. She was feeble in strength and was invariably attended by some competent person. Mrs. Hyatt was her niece, whom she loved, whom she had been in the habit of visiting. Mrs. Hyatt's relations to Mrs. Hammell for years had been so intimate that there can be no question that she knew fully all of Mrs. Hammell's weaknesses and dependence upon her care and protection. Mrs. Hammell appears to have believed and trusted Mrs. Hyatt absolutely.

At the time the deed was made, Mrs. Hammell had been brought by Mrs. Hyatt to her house on a visit. Prior to that time the evidence shows Mrs. Hammell had made her home happily with her son, for six years, without charge. There is not a word of proof that during these six years the mother and son ever had a difference, either in their personal relations or in the conduct of her business by him, save as the mother's declarations made after she came under Mrs. Hyatt's control, show the existence of such dissentions. Mrs. Hyatt knew how the mother and son lived during these six years, for she frequently visited intimately at their house, in Philadelphia, but she offers no proof whatever that during that time she saw or heard of any difficulty between Mrs. Hammell and the complainant. When, however, Mrs. Hammell had been brought by Mrs. Hyatt over to her house in Camden, Mrs. Hammell's supposed wrongs received from her son began to be exploited, but always solely through what the witnesses declare Mrs. Hammell said while at Mrs. Hyatt's house, never by proof of what the witnesses saw or heard of what was done at the son's house, in Philadelphia. All these declarations are in the nature of hearsay. Mrs. Hammell's unsworn statement might be in evidence to show her condition of mind, but not to prove the thing stated to be a fact.

After Mrs. Hammell had been in Mrs. Hyatt's care for about four months, Mrs. Hyatt's husband had "business of importance" which he invited an attorney to transact, who had never seen or heard of Mrs. Hammell, and Mr. Boardman who had long known her. Mr. Boardman, as soon as the probable character of Mr. Hyatt's business was indicated, left the house, refusing to participate. When Mr. Hyatt's "business of importance" was opened to the lawyer, it was at once made apparent that though he had been invited to attend upon Mr. Hyatt's business, Mrs. Hammell was put to the front as the person whose business was to be transacted. The lawyer knew nothing of Mrs. Hammell's infirmities, of her property, of her son's conduct, or of her own control of her property, save as she related them to him. Mrs. Hammell stated her grievances to the lawyer in Mr. and Mrs. Hyatt's presence, and this narration

throws light on the origin of the deed now attacked. Mrs. Hammell told the attorney that she desired to consult him about her property, that her troubles were that her son was collecting her interest on her government bond and the rents of her house, and that she desired to get from his possession her personal property, consisting of a small quantity of household goods, &c. She told the lawyer that her son had been "gouging her ever since he was big enough." She evidently believed that her son was wronging her, that she could not collect her interest or her rents or have her household goods, because of his interference with her affairs. Mrs. Hyatt sat by and knew that Mrs. Hammell had this belief; she knew the lawyer was about to advise Mrs. Hammell on this basis. All these three causes of supposed grievance of Mrs. Hammell against her son, Mrs. Hyatt knew were in fact false.

As to the collection of interest by the son on the only bond which Mrs. Hammell owned, the railroad bond, Mrs. Hyatt herself testified, not that the son collected the interest in defiance of his mother's wish, but that Mrs. Hammell told her that " she must go home in time to draw her interest or Lewis would have it drawn for me," showing that the collection of the interest was entirely at Mrs. Hammell's choice.

As to the rents of the house, the testimony shows that Mrs. Hammell and Mrs. Hyatt had, for several months next preceding December 4th, 1897 (when this interview with the lawyer took place), together personally collected these rents and had notified the tenant not to pay them to the son. The son had not collected any rents since the early part of the preceding August, nor had he attempted since that time to interfere with his mother and Mrs. Hyatt in their collection of these rents. So that on December 4th Mrs. Hammell had in fact no grievance on this point on which she needed relief. Mrs. Hyatt knew this at the time, for, as stated, she had participated in these collections of the rent and in the notice to the tenant.

The small portion of household goods of Mrs. Hammell were in the possession of the son because they were at his house, where Mrs. Hammell made her home, but Mrs. Hammell had

never asked for their delivery to her, and her son had no reason to suppose she wanted them.    He had never denied her right to them.

As to all these supposed wrongdoings of the son, of which Mrs. Hyatt had such detailed knowledge, not one of them appears ever to have been made the subject of complaint to him, either by his mother or by Mrs. Hyatt.    It was perfectly reasonable and natural that her only son, with whom this old lady had freely lived for six years, should care for her property and wait upon her until notified by her that he should treat her as a stranger.

It is obvious that if the truth had been made known to the lawyer he would have had no occasion to advise Mrs. Hammell to make a deed.    Mrs. Hyatt knew the truth.    She did not tell the lawyer that Mrs. Hammell could collect the interest on her bond whenever she desired to do so, nor that she had for four months collected the rents without hindrance and that she had never asked for possession of her household goods.    If she had the lawyer would probably have advised her that a notice to the party paying the interest not to pay it, and to the tenant not to pay the rent except to Mrs. Hammell or her order, would have abundantly protected Mrs. Hammell from the imaginary dangers which she feared.    But if this had been done there would have been no deed made by Mrs. Hammell to Mrs. Hyatt.

The lawyer accepted Mrs. Hammell's statements as true.    He advised her, at the interview of December 4th, 1897, that in order to be relieved she might make a deed of trust conveying her property.    She disapproved of this.    He then told her she might make a will of her property or give a deed or bill of sale for it at once.    She told him she wanted her daughter, Mrs. Cominsky, to have the $1,000 bond when she died, and her niece, Mrs. Hyatt, to have the Locust street house.    He told her she might sue in replevin or trover for the bond and household goods, and " that another way of keeping her son from collecting this rent was to make a deed at once to her niece, Mrs. Hyatt."    She said she would like to do that, but that she wanted

the rents as long as she lived.   The lawyer says he then suggested that she make the deed in consideration of her niece giving her the rents and providing her with a home as long as she lived.   Mrs. Hyatt assented to this, and Mrs. Hammell said she would think it over and come to the lawyer's office and let him know.

Subsequently, in Mrs. Hyatt's presence, she told the lawyer that she had decided to go ahead with the deed, and at interviews at which either Mr. or Mrs. Hyatt was always present, Mrs. Hammell made to Mrs. Hyatt the deed now in dispute. It was executed at the lawyer's office on December 13th, 1897, acknowledged and recorded the same day.

From the above reference to the lawyer's testimony, it plainly appears that the matter which Mrs. Hammell believed it was desirable and necessary to accomplish was not a disposition or conveyance of her property to anyone, but the recovery of the possession of her personalty, and especially the stopping her son from collecting the interest on her bond and the rents from her house, and that the subject of a deed to Mrs. Hyatt, so far as Mrs. Hammell and the lawyer were concerned, was not the business which occasioned the interview.   The lawyer appears to have advised Mrs. Hammell to make the deed to Mrs. Hyatt because he was told the son was collecting the rents of the property conveyed by the deed and as a means of preventing it. Mrs. Hyatt, the grantee in the deed, stood by and accepted it, though she knew it was obtained by making Mrs. Hammell believe a falsehood, for, as above stated, Mrs. Hyatt had herself aided Mrs. Hammell in collecting these rents for the past four months.

Mrs. Hyatt knew Mrs. Hammell's weakness of mind and her utter dependence upon those who had her in charge.   With this knowledge, Mrs. Hyatt took Mrs. Hammell from her home at her son's house and brought her over to Camden on a visit. She thus voluntarily placed herself in the position of a caretaker or guardian of Mrs. Hammell, and will be charged by the law with the duties which attend upon such a relation, and will not be allowed to take a benefit obtained by inducing or per-

mitting the defendant party to act under beliefs known by the beneficiary to be false.

The elementary question in cases of this character is whether the party who stands in the position of caretaker has, by fraudulent contrivance or conduct, induced the weaker party to make the contract. Mere inadequacy of price, unless it were so gross as to be unconscionable, would not of itself be evidence of fraud, but leading the weaker party to believe that property while standing in her name is in danger when in fact it is not, and standing by, knowing but not disclosing the truth when this false belief is made the basis or excuse for the conveyance of the property by the weaker party to the caretaker, is conduct on the part of the taker which savors of fraud. When such a contract is thus obtained, the fact that there may have been to some extent a valuable consideration paid or promised, does not relieve the contract from the fraudulent taint, else fraud-doers might readily protect their enjoyment of the fruits of their fraud by the payment of an actual and valuable, though to them profitable, consideration. They are not entitled to the reasonable profit which induces all contracts, when the contract is procured to be made by falsehood.

The counsel for the defendants insists that the deed to Mrs. Hyatt was not a gift and that it must not be tested by the rules applied to gifts; that a valuable consideration was in fact given for the deed, and that it was a matter of commercial contract for an adequate consideration between Mrs. Hammell and Mrs. Hyatt. But the whole trend of the proof is to the contrary.

Mrs. Hyatt swears that so early as August 8th, 1897, Mrs. Hammell told her, "I am going to give you that house," not sell it to secure a living, reserving rents. Other witnesses state Mrs. Hammell's declaration of an intent to give, all made while she was under Mrs. Hyatt's care. None refers to any mention of a sale.

Again, there was no pretence of observance of the ordinary inquiries which attend a sale of real estate. No searches were made to ascertain whether there were any mortgages or judg-

Hammell *v.* Hyatt.

ments against the land.   Mrs. Hyatt was well content to take
a deed and with it the chances of unlimited prior liens.   No
inquiry even appears to have been made on the subject.

The contract to support Mrs. Hammell was in no way indi-
cated on the face of the deed—was executed without witnesses
or acknowledgment by Mrs. Hyatt—and if it ever was deliv-
ered to Mrs. Hammell, the delivery, considering Mrs. Ham-
mell's utter dependence upon Mrs. Hyatt, was no more than a
delivery to the latter.   Nothing prevented Mrs. Hyatt from at
any time suppressing the contract, and Mrs. Hammell's enfee-
bled mind and impaired memory would have been useless in
support of any attempt to assert rights under it.   Had the con-
tract for support been *bona fide* it should have been so referred
to in the deed that the grantee could have been bound by it.
But this agreement to support, which was wholly executory,
was not only omitted from the deed but it is doubtful if it ever
was delivered.   Mrs. Hyatt, in her answer, alleges that she has
possession of it and tenders its production.   She did produce it
at the hearing.   She had it always in her power to have sup-
pressed it.   Such a retention was, in *Mott* v. *Mott, 4 Dick. Ch.
Rep. 209*, held to be a fraud, and it was declared that the omis-
sion of such a contract from the deed is of itself a badge of
fraud, upon the broadly-equitable ground that it is the duty of
one occupying the position of a caretaker, who makes a contract
with one dependent upon him for protection, to see that the con-
sideration which is to proceed to the weaker party is secured as
fully and as perfectly as that which passes to the caretaker.

That there was an attempt to give to the transaction now in
dispute a commercial character is shown by the actual payment
of the nominal consideration of $1.   But this unusual payment
is of itself an indication of a purpose to give color to the matter
which, it was felt by those conducting the business, it would not
otherwise have.

That the alleged bargain was greatly to Mrs. Hammell's dis-
advantage is plainly apparent.   At the time the arrangement
was made Mrs. Hammell had support and maintenance from
her son without charge, and Mrs. Hyatt knew this, because an

inquiry was made in her presence, before the attorney, whether the son might not make a claim for supporting his mother. I am constrained to believe that Mrs. Hyatt knew that Mrs. Hammell had lived happily with her son. She knew that Mrs. Hammell, at the time the deed was made, was utterly dependent upon her for care and protection, yet Mrs. Hyatt accepted from Mrs. Hammell a deed by which she conveyed to Mrs. Hyatt the fee of all the land she had, ostensibly in payment for a support which she was getting for nothing from her son.

Another indication that it was Mrs. Hyatt's and not Mrs. Hammell's purpose which controlled the situation is given when the events subsequent to the lawyer's interviews with Mrs. Hammell are considered. Mrs. Hammell, in that interview, is reported to have declared, when asked what she would have done with her property—whom she wanted to have it—that "she wanted her daughter, Mrs. Cominsky, of Baltimore, to have the $1,000 bond when she died, and she wanted her niece, Mrs. Hyatt, to have the property on Locust street." Mrs. Hyatt got the deed for the Locust street house, but no provision was ever made to give the bond to Mrs. Cominsky.

There was some inquiry as to legal steps to recover Mrs. Hammell's personalty, which were directed by Mrs. Hyatt (in Mrs. Hammell's name) to be stopped, on the excuse that she had no money. But the lawyer testified that he offered to negotiate a mortgage on the property to raise the necessary money for prosecuting the case, but this Hammell, Mrs. Hyatt being present, declined to do. No demand was ever made upon the son to deliver over the bond or the personal property or that he stop collecting the rents.

In short, the situation opened to the lawyer as a consultation about Mrs. Hammell's property, resulted solely in securing to Mrs. Hyatt her deed for the Locust street house. Before consultation and the making of the deed, Mrs. Hammell got the rents, though she believed her son was getting them. After the deed was made Mrs. Hyatt (though very unwillingly) herself testifies that Mrs. Hammell continued to collect them. This was directly in the face of the effects of both the deed and the

agreement, for the deed gave the rents to Mrs. Hyatt and the agreement only provided that Mrs. Hammell should have the net income after payment of taxes, &c.

Before the consultation the son had the custody of the bond, and if his mother did not collect the interest he drew it for her. After the consultation he continued to do just as he had done before. Nothing was done to relieve Mrs. Hammell from the injuries she was supposed to be suffering by reason of the grievances opened to the lawyer. She, in her inability to comprehend the situation of affairs, went on happily collecting her rents the same as if she had made no deed. Her consciousness was unaffected by the transaction, which made no outward and visible change in her ownership of the property. Mrs. Hyatt went with Mrs. Hammell when the latter collected the rents, after the deed was made, when she knew Mrs. Hammell was not entitled to take them, but made no effort to explain to Mrs. Hammell that, since making the deed, she had no right to the rents.

The weight of the evidence shows that Mrs. Hammell, in her enfeebled condition of mind, was wholly dependent upon Mrs. Hyatt, who was bound to care for and protect her, and that the latter obtained the deed in question by a fraudulent assent to Mrs. Hammell's action while under a false belief and for a consideration executory in its character, which Mrs. Hyatt retained the power to avoid. The action of Mrs. Hyatt was a fraud and an imposition upon Mrs. Hammell, which makes void the deed so obtained.

I will advise a decree in conformity with the views above expressed.